UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICK LINDSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 C 1967 |
| | ) | |
| OFFICER MICHAEL ORLANDO, Star 5594, | ) | Judge Rebecca R. Pallmeyer |
| OFFICER JAIME FALARDEAU, Star 9431, | ) | |
| in their individual capacity, the CITY OF | ) | |
| CHICAGO, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rick Lindsey, a resident of Utah, is the chairman and CEO of Prime Insurance Company, which has offices in several cities, including Chicago. Lindsey's family flew to Chicago for a family gathering in June 2014. Their flight was delayed for several hours, and after Lindsey's brother became involved in a dispute with airline staff at O'Hare, Chicago police officers were called and Defendant Officers Michael Orlando and Jamie Falardeau arrested both the brother and Lindsey himself. Plaintiff Lindsey alleges that the arrest caused significant harm to his business. Specifically, Lindsey says that as a result of his arrest, one of his businesses was delayed in setting up operations in Florida, causing him personal losses in the form of a reduced bonus and lowered stock value.

Defendant Officers and the City of Chicago have moved for partial summary judgment on Lindsey's damages claims. Defendants argue that Plaintiff lacks standing to bring a suit for "corporate damages." Even if the court concludes he has standing, Defendants contend, his damages claims are too speculative and their cause too remote for him to recover. Plaintiff argues that he seeks to recover personal losses, not corporate damages, and that he has proven his claims with requisite specificity. The court agrees with Defendants on both scores; Plaintiff is not entitled to recovery for harms suffered by his business, and the losses in this case are too remote

from Plaintiff's arrest to justify an award. Defendants' motion for partial summary judgment is granted.

## **FACTUAL BACKGROUND**

The facts are presented in the parties' Local Rule 56.1 statements: Plaintiff's Rule 56.1 Statement of Facts [101], cited here as "Pl's 56.1" and Local Rule 56.1 Statement of Material Facts in Support of Motion for Partial Summary Judgment on Elements of Plaintiff's Damages Claims [86], cited as "D's 56.1." Plaintiff is the Chairman of the Board and CEO of Prime Holdings Insurance Services ("Prime Holdings"). Pl.'s 56.1 ¶ 1, 2. In October of 2013, Plaintiff owned a majority of the voting shares and approximately 48 percent of the total shares of Prime Holdings. Pl's 56.1 ¶ 2. Prime Holdings owns a number of insurance businesses, including Prime Property Casualty Insurance Company ("PPCI"). D's 56.1 ¶ 3, 4. PPCI is domiciled in Illinois and was incorporated on March 6, 2012. D's 56.1 ¶ 4.

On October 31, 2013, PPCI filed a Uniform Certificate of Authority Application ("COA application") with the Florida Office of Insurance Regulation ("FLOIR") in an effort to be admitted to carry out insurance business in Florida. D's 56.1 ¶ 13. The COA application process is typically fairly informal; FLOIR analysts and lawyers review the application and relay questions to the applicant. D's 56.1 ¶ 14. FLOIR enjoys broad discretion in deciding whether to grant a COA application. D's 56.1 ¶ 16. As directed in Chapter 624.404 of the Florida Insurance Code, FLOIR considers the following factors in evaluating an application: the applicant's forthrightness or misrepresentations in the written application; the applicant's character; the applicant's financial situation and bankruptcy history; the applicant's criminal record, if any; any conflicts of interest; the applicant's history of history of regulatory compliance or violations in other states, and other states' denials of applications for admittance. D's 56.1 ¶ 15, 17. In addition, Florida, like many states, has a "seasoning requirement"—that is, a requirement that the applicant have been in business for at least three years before the COA application can be granted. D's 56.1 ¶ 21. FLOIR does have discretion to waive this seasoning requirement, *id,* but Plaintiff's expert witness

testified that Florida is one of the top five most difficult states in which to obtain an insurance license.  D's 56.1 ¶ 22.

As part of PPCI's COA application, Plaintiff was required to submit a biographical affidavit to FLOIR.  D's 56.1 ¶ 35.  Question 11(d) of the form affidavit called for Plaintiff to disclose whether he had ever "been charged with, or indicted for, any criminal offense(s) other than civil traffic offenses."  *Id.*  Earlier that year, on January 16, 2013, Plaintiff had pleaded guilty to a Driving While Impaired charge based on an August 29, 2012 traffic stop in his home state of Utah in which law enforcement recovered a marijuana pipe containing a residual amount of marijuana.  Pl's 56.1 ¶ 18.  Plaintiff nevertheless answered "no" to question 11(d) and did not disclose the arrest and guilty plea because his attorney advised him that the initial charges and ultimate conviction fell under the Utah traffic code.  *Id.*

The COA application also asks whether the applicant had been denied admission to any other state within the past ten years.  D's 56.1 ¶ 31.  There is an ongoing duty for the applicant to supplement its answer in the event that it is denied admission in another state while the application is pending.  *Id.*  PPCI answered "no" to this question.  *Id.*  Defendants claim that this response was false, in that in 2005, the state of Wisconsin had denied Plaintiff's application.  D's 56.1 ¶ 32.  In addition, Defendants assert that while PPCI's COA application was pending before FLOIR, PPCI "received a series of denials and requests to withdraw" from the following states:

> (a) Kentucky on November 6, 2013 for failure to meet seasoning requirements or obtain a waiver; (b) New Jersey on April 7, 2014 for failure to meet seasoning requirements or obtain a waiver; (c) Georgia on October 23, 2014 for "several concerns"; (d) Rhode Island on November 26, 2014 for failure to have "established a solid enough history of profitable business"; (e) Hawaii on June 15, 2015 for failure to meet seasoning requirements or obtain a waiver; and (f) New York on October 20, 2015 for failure to meet seasoning requirements or obtain a waiver.

D's 56.1 ¶ 33.[1]  Plaintiff argues that PPCI's response was truthful in that PPCI, not Plaintiff, was the applicant, and it was Plaintiff's application, not PPCI's, that was denied by Wisconsin in 2005.

---

[1]  It appears that the states of New Jersey and New York were also concerned about PPCI's capital and cash flow, concerns these states identified as reasons for rejecting PPCI's

Plaintiff's Response to Defendants' Rule 56.1 Statement of Facts (hereinafter, "Pl's 56.1 Response") ¶ 32. Plaintiff further argues that PPCI had no duty to supplement its application because each state requested that PPCI withdraw or temporarily closed PPCI's application; those actions, Plaintiff contends, do not constitute a denial. *Id.*

On November 21, 2013, FLOIR sent a letter to PPCI requesting additional materials and stating in part, "At this time, the Office does not believe the Applicant meets the seasoning requirements or the waiver provision per Section 624.404(2)." D's 56.1 ¶ 41. On December 19, 2013, PPCI submitted a request for a waiver of the three-year seasoning requirement. D's 56.1 ¶ 43. On April 17, 2014, FLOIR sent a letter to PPCI stating that its application was still incomplete and further stating:

> The Office continues to believe the Applicant does not meet the seasoning requirements of Section 624.404(2), Florida Statutes nor the criteria for a waiver. However, if the Applicant submits a financial statement indicating net income (positive) that can offset 2012 and 2013, provide a product not readily available (i.e., [coverage for] parasailing), and provide projections indicating profitability, then the Office may consider a waiver of seasoning requirements.

Letter from FLOIR to PPCI of 4/17/14, Ex. T to D's 56.1. Nothing in the record shows whether PPCI was able to or did provide this information.

On June 15, 2014, Plaintiff was arrested at O'Hare International Airport, and on June 26 he was charged with two counts of aggravated battery. Pl's 56.1 ¶ 24. Five days after the arrest, on June 20, 2014, FLOIR sent PPCI a letter identifying four items necessary to complete the application. Letter from FLOIR to PPCI of 6/20/14, Ex. W to D's 56.1. Specifically, the letter asked PPCI to provide information concerning the personal bankruptcy of Prime Holdings' Treasurer and CFO, Brent Seegmiller; explanations for Plaintiff's regulatory discipline and licensure history; and information about a previous civil suit against Plaintiff and Prime Holdings

---

waiver request. *See* Letter from New Jersey to Plaintiff of 4/7/14, Ex. M to D's 56.1; Letter from New York to Plaintiff of 8/20/15, Ex. M to D's 56.1. Also, Rhode Island regulators invited PPCI to reapply "when the company has established a three year positive financial history," which reads as a seasoning requirement in so many words. *See* Letter from Rhode Island to Plaintiff of 11/26/14, Ex. M to D's 56.1.

4

and why it was not disclosed in Plaintiff's biographical affidavit. *Id.* Further, the letter stated, "It has been revealed that on August 29, 2012 in Salt Lake City, Utah, Mr. Lindsey was arrested with four charges," and requested an affidavit from Plaintiff setting forth specific details regarding the arrest, documentation including the disposition of the case, and an explanation as to why Plaintiff failed to disclose the arrest in his previous biographical affidavit. *Id.* In PPCI's response on June 25, 2014, Plaintiff disclosed his O'Hare arrest. D's 56.1 ¶ 50. On July 22, 2014, at the recommendation of its counsel, PPCI voluntarily withdrew its COA application. D's 56.1 ¶ 51; Pl's 56.1 ¶ 16.

On April 14, 2015, Plaintiff was acquitted of the criminal charges related to the O'Hare arrest. D's 56.1 ¶ 53. On July 27, 2015, PPCI refiled its COA application. Pl's 56.1 ¶ 19. That application was approved on October 13, 2015, and PPCI began selling insurance products in June 2016. *Id.* Plaintiff claims that the O'Hare arrest caused a delay of ten to 13 months in PPCI's entry into the Florida insurance market. Pl's 56.1 ¶ 30. In support, Plaintiff has offered the expert testimony of Timothy Schoenwalder, a Florida attorney who has served as outside litigation counsel to the Florida Department of Licensure, the predecessor to FLOIR. P's 56.1 ¶ 20. Mr. Schoenwalder opined that had PPCI not withdrawn its initial COA application, FLOIR regulators would have denied that application on the basis of the two criminal charges then pending against Plaintiff. Expert Report of Timothy G. Schoenwalder, Esq., Exh. G to P's 56.1 (hereinafter, "Schoenwalder Report") ¶ 20. But for those criminal charges, he asserted, PPCI's COA application would have been granted sometime between August 18, 2014 and November 18, 2014. Schoenwalder Report ¶ 21. Mr. Schoenwalder acknowledged in his deposition, however, that a "criminal background" is not an automatic basis for rejection, and that he had experienced some success in seeking licensure for clients who had criminal convictions in their record. Schoenwalder Dep. 17:9; 18:13-19:1.

## **DISCUSSION**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If there is a genuine dispute of material fact, the court "interpret[s] all facts and draw[s] all reasonable inferences in favor of the nonmoving party. *Sinn v. Lemon*, 911 F.3d 412, 419 (7th Cir. 2018). "The underlying substantive law governs whether a factual dispute is material." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (*quoting Anderson*, 477 U.S. at 248). Because Prime Holdings and PPCI are both incorporated in Illinois, and the incident giving rise to Plaintiff's alleged injuries occurred here, Illinois law governs this dispute. *See Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006). Defendants argue that they are entitled to summary judgment because Plaintiff lacks standing to recover damages incurred by PPCI and because he cannot establish that the O'Hare incident was the cause for denial of the COA. The court addresses those argument in turn.

**Plaintiff Lacks Standing**

First, Defendants contend that Plaintiff does not have standing to sue for the damages at issue because they are "corporate damages" and Plaintiff does not have standing to bring a derivative suit. Under Illiinois law, a shareholder cannot sue directly "'when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his or her corporate shares resulting from the impairment of corporate assets.'" *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1054, 827 N.E.2d 949, 955 (2nd Dist. 2005), quoting 13 Ill. L. & Prac. Corporations § 159 at 400 (2000). "Injury to the corporation, however, does not prevent suit by an investor who suffers a distinct personal injury." *Frank v. Hadesman and Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996). "A suit brought by a stockholder upon a personal claim is by its nature distinguishable from a proceeding to recover damages or other relief for the corporation." *Zokoych v. Spalding*, 36 Ill. App. 3d 654, 663, 344 N.E.2d 805,

813 (1st Dist. 1976). "The law controlling whether an action is derivative or direct . . . requires a strict focus on the nature of the alleged injury, i.e., whether it is to the corporation or to the individual shareholder that the individual shareholder that injury has been done." *Small v. Sussman*, 306 Ill. App. 3d 609, 644, 713 N.E.2d 1216, 1220 (1st Dist. 1999).

Plaintiff Lindsey filed this action under 42 U.S.C. § 1983 for the losses he suffered as a result of an alleged false arrest. If he establishes a violation of his rights, he is entitled to recover losses he suffered as a result of that violation, including personal injuries, if any; emotional distress; or pay he lost during the time that the arrest and associated legal proceedings prevented him from working. Losses suffered by his incorporated business are separate losses, suffered by any owners or shareholders only as a result of the losses to their business; they are not directly recoverable by Plaintiff himself.

**Plaintiff Has Not Established Causation**

Plaintiff's claim to losses suffered by his business fails for a second reason, as well: he cannot establish that Defendants' conduct caused those losses. Courts apply common law rules of tort causation to civil rights cases. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010). Causation is typically a question of fact for the jury, but if there is insufficient evidence for the jury to reach a factual conclusion without undue speculation, summary judgment is appropriate. *Shepard v. State Auto Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006).

Causation embodies two distinct concepts: cause in fact and legal cause. *Turcios v. DeBruler Co.*, 2015 IL 117962 at ¶ 23, 32 N.E.3d 1117, 1124. Plaintiff here invokes the "substantial factor" test to prove causation in fact. Under that test, the defendant's conduct is said to be the cause of an event if it was a material element and a substantial factor in bringing about that event. *Thacker v. UNR Indus., Inc.*, 151 Ill. 2d 343, 354-5, 603 N.E.2d 449, 455 (1992). "If the plaintiff's injury would not have occurred absent the defendant's conduct, then the conduct forms a material element and substantial factor in bringing about the injury." *Berke v. Manilow*, 2016 IL App (1st) 150397 at ¶ 33, 63 N.E.3d 194, 203-4 (*citing Abrams v. City of Chicago*, 211 Ill.

7

2d 251, 258, 811 N.E.2d 670, 675 (2004)). While the substantial factor test is normally left to the jury, "if there is insufficient evidence for a jury to reasonably find that the defendant's conduct was a cause of the plaintiff's harm or injury," then the defendant's conduct was not a substantial factor as a matter of law. *Thacker*, 151 Ill. 2d at 355, 603 N.E.2d at 455. The "mere possibility" of causation is not sufficient, and "when the matter remains one of pure speculation or conjecture, or the possibilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant." *Collins v. Amer. Optometric Ass'n*, 693 F.2d 636, 640 (7th Cir. 1982) (*quoting* W. Prosser, *The Law of Torts*, 241 (4th ed. 1971)).

Legal cause, on the other hand, requires an assessment of foreseeability. *Turcios*, 2015 IL 117962 at ¶ 24, 32 N.E.2d at 1124. Courts ask whether the injury is the type that a reasonable person would see as a "likely result" of his or her conduct, or whether the injury is so "highly extraordinary" that imposing liability is not justified. *Id.*; *see also City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395, 821 N.E.2d 1099, 1127 (2004) (legal cause "is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it" (internal quotation marks omitted)).

The case of *Kiswami v. Phoenix Sec. Agency, Inc.,* is instructive here. In *Kiswami*, the plaintiff claimed that as a result of his allegedly false arrest, he lost out on a number of business deals, including a planned mortgage finance business, two hotel deals, and a contract to provide security for the CTA. *Kiswami v. Phoenix Security Agency, Inc.*, 247 F.R.D. 554, 556-7 (N.D. Ill. 2008). Defendants in that case moved *in limine* to exclude these three categories of damages as well as a fourth category in which plaintiff claimed that said lost business deals caused the repossession of several of plaintiff's vehicles. *Id.* at 555-6. The court sustained defendants' objection to each of these categories of damages, reasoning that the claims were "speculative, there [was] no legal cause, and it was not foreseeable." *Id.* at 559-61. Of particular importance, the court noted that, despite plaintiff's claim that he lost the hotel deals because of his arrest, plaintiff had "no valid contract or affirmative assurance" that the deal was going to go through and

8

there were "numerous contingencies [that] could have caused the deal to fall through." *Id.* at 560. In light of those contingencies, the court found that it would be "speculative to conclude that the failure of the hotel deals was a consequence of [p]laintiff's arrest." *Id.* Further, the court concluded that the loss of two hotel deals was not a "foreseeable consequence" of plaintiff's arrest. *Id.* With regard to the mortgage finance business, the court found that plaintiff never took any steps to establish the business after his arrest. *Id.* The court concluded that it was the plaintiff's own inaction, not his arrest, that caused the mortgage business to fizzle. *Id.* The court found that like the hotel deals, the failure of the mortgage business was "clearly not foreseeable." *Id.*

Plaintiff Lindsey's claim in this case bears a striking resemblance to *Kiswami*. Like the *Kiswami* plaintiff, Plaintiff here had no affirmative assurances that FLOIR was going to grant PPCI's waiver request, and ultimately its COA application. To the contrary, there were "numerous contingencies" that might have caused FLOIR to deny the application. The COA application could have been denied on account of Plaintiff's 2012 arrest, his failure to disclose that arrest and resulting conviction, the personal bankruptcy of Prime Holdings' CFO, or for any other reason within FLOIR's discretion. Plaintiff argues that none of these factors defeats his claim because each of these grounds was present when PPCI refiled its application after Plaintiff was acquitted and it was granted. (Memorandum in Support of Rick Lindsey's Response to Defendant's Motion for Partial Summary Judgment [1]2] (hereinafter, "Pl's Response"), at 14.) This argument ignores two important factors. First, PPCI's application was not denied; it was withdrawn. Like the *Kiswami* plaintiff, it was Plaintiff's own decisions that caused PPCI's application to fail. PPCI's decision to withdraw the application is an intervening cause that cuts off Defendants' liability. Second, by 2015 when PPCI refiled its application, it had been in business for three years and therefore met Florida's seasoning requirement and overcame one potential obstacle for approval. It is telling that four states, Kentucky, New Jersey, Hawaii, and New York, all rejected PPCI's applications for failure to meet seasoning requirements and a fifth state, Rhode Island, did

likewise for essentially the same reason.[2]  In light of these rejections and the other issues with PPCI's application, it cannot be said with requisite certainty that FLOIR would have granted PPCI's waiver request or COA application had Plaintiff not been arrested.

Plaintiff cites *Blasius v. Angel Auto., Inc.*, 839 F.3d 639 (7th Cir. 2016), in arguing that "the conclusions of the causation experts and witnesses nonetheless create a triable issue of material fact that permits the case to reach a fact-finder." (Pl's Response at 15.)  The court disagrees.  In *Blasius*, the Seventh Circuit concluded that the district court erred in rejecting an expert's opinion as speculative; the district court had considered just two pages from the expert's deposition and noted the expert's failure to testify that the harm was "more likely than not" caused by the defendant.  *Blasius*, 839 F.3d at 645-6.  In reversing the district court, the Court of Appeals observed that as a non-lawyer, the expert could not be expected to understand the significance of the expression "more likely than not," and that a comprehensive reading of the deposition showed that the expert believed that the defendant's conduct as causing harm was the "most likely scenario." *Id.* at 646, 648.  The *Blasius* opinion does not suggest that an expert's speculative testimony is enough to support a jury verdict.  Plaintiff's expert, Mr. Schoenwalder, claims to know with certainty what FLOIR regulators would have been thinking, had they had an opportunity to review PPCI's waiver request and had Plaintiff not been arrested.  True, the expert has experience with Florida insurance regulation; but his views about what FLOIR regulators might think or do are by definition speculative.  Mr. Schoenwalder's conjecture is insufficient to permit this damage claim to reach a jury.

Plaintiff's claim fails for yet another reason as well: The injury he claims here is fairly characterized as "highly extraordinary," and plainly not foreseeable.  *See Turcios*, 2015 IL 117962 at ¶ 24, 32 N.E.2d at 1124.  No reasonable person would predict that the arrest of a Utah resident in Illinois would cause a company to withdraw a pending application to do business in Florida,

---

[2]  *See* n. 1 *supra*.

delaying that company's foray into the Florida insurance market, depriving it of profit, and causing personal loss to the Plaintiff. The chain of events Plaintiff asks the court to accept is simply too long, too tenuous, and too unpredictable to hold Defendants accountable for Plaintiff's personal losses that resulted.

## CONCLUSION

Plaintiff Lindsey claims that his June 2014 arrest resulted in the "denial" of his company's application to engage in insurance business in Florida. Even assuming that Plaintiff has standing to bring a claim for this "denial" (really, a voluntary withdrawal of that application), the alleged injuries are too speculative and too remote for a reasonable jury to hold Defendants accountable for them. Accordingly, Defendants' Motion for Partial Summary Judgment [84] is granted.

ENTER:

*[signature: Rebecca R. Pallmeyer]*

Dated: March 26, 2019

REBECCA R. PALLMEYER
United States District Judge